**SECURITY STATE BANK AND TRUST,**
**Appellant,**

**v.**

**Charles D. CRAIGHEAD, Appellee.**

**No. 14722.**

Court of Civil Appeals of Texas.

San Antonio.

March 12, 1969.

Rehearing Denied April 16, 1969.

Allison & Wallace, Kerrville, Moursund & Ferguson, Johnson City, for appellant.

Musselwhite, Maroney & Celý, Lufkin, Cleo Haston, Houston, for appellee.

BARROW, Chief Justice.

This is an appeal by Security State Bank & Trust, hereinafter referred to as Bank, from a judgment in favor of appellee, Charles D. Craighead, on a partial jury

verdict[1] in appellee's suit to recover damages for Bank's wrongful attachment of personal property. Bank asserts twenty-seven assignments of error, many of which contain several sub-points.

The case was vigorously contested during the trial which extended over two weeks and the evidence was sharply conflicting on many issues. Twenty-seven special issues were submitted to the jury, and a question is raised at the outset as to whether the partial verdict was unanimously agreed to by such jury. The jury deliberated during two days before reporting to the court that they were hopelessly deadlocked and could not agree on the answers to Issues Nos. 7, 9, 25–27. They had previously written notes to this effect, and as a partial result of the deadlock Issues Nos. 11–15 were withdrawn by the court. The jury was brought into the courtroom and the foreman advised the judge of such hopeless deadlock. Apparently, the trial judge had not considered the possibility of receiving a partial verdict and planned to discharge the jury. Before the jury was discharged, the attorney for appellee, hereinafter referred to as plaintiff, requested the judge to ascertain if the jury had agreed on any answers. The jury was polled by the judge and all expressed agreement to the thirteen answers which had been written in the appropriate places provided in the charge. Thereupon the judge requested the foreman to sign the charge. Following such signing, the jury was discharged on March 10, 1967. Neither party requested the judge to declare a mistrial and he did not declare same. In fact the attorney for plaintiff stated at said time that he would subsequently move for a judgment on the verdict, and he anticipated the attorney for Bank would do so also. Bank subsequently filed a motion for mistrial wherein it asserted that the partial verdict had not been agreed to by all jurors.

1. The jury returned a verdict substantially as follows:

1. Plaintiff did not make any of the seven enumerated representations prior to the loan being made to him.

2–6. Conditionally submitted and therefore not answered.

7. Jury unable to agree as to whether Bank would probably have lost the debt unless such attachment had been issued and levied.

8. Stehling was not justified in causing deputy sheriff to levy upon all the property attached to satisfy the Bank's debt of $2,200.

9. Jury unable to agree as to what property he was not justified in causing to be levied upon.

10. The deputy sheriff levied upon all of the hogs owned by plaintiff at such time.

11–15. These issues were withdrawn from the jury's consideration by instruction of the court after jury reported inability to agree on any but No. 11.

16. Plaintiff owned the crimp-o-matic feed mill on July 7, 1964. (By the instruction under said issue, the question of payment did not enter into such ownership.)

17. The fair market value of the five types of personal property attached was determined. Total of the five was $7,938.

18. The sum of $20,000 would fairly and reasonably compensate plaintiff for net profits he would have made between July 7, 1964, and date of trial, but was prevented by the attachment.

19. The fair market value of fixtures located on said hog farm lost by the attachment was $9,000.

20. The sum of $528.00 would reasonably compensate plaintiff for the amount paid for ground lease on the hog farm prior to attachment.

21. Plaintiff had a written option to buy the land on which the hog farm was situated.

22. The sum of "None" would reasonably compensate plaintiff for the loss in not being able to exercise the option to buy the hog farm property which he sustained as the proximate result of the attachment.

23. Bank accepted benefits of the attachment with full knowledge of the facts surrounding the issuance and levy of same.

24. Bank ratified, adopted or approved Arthur Stehling's actions with respect to levy of the attachment.

25–27. Jury unable to agree as to whether Stehling acted maliciously or without probable cause in causing the writ of attachment to be levied against plaintiff's property, and the amount of exemplary damages to be awarded.

After several hearings on plaintiff's motion for judgment, and Bank's motions for mistrial and for judgment non obstante veredicto, on August 31, 1967, the court advised the attorneys that it was going to grant plaintiff's motion for judgment. The judgment, which was signed on September 26, 1967, recites in part that "the said verdict of the Jury was in due, proper and legal form and order, the said answers of the Jury was by the Court accepted in open Court on the 10th day of March, A. D., 1967, and ordered by the Court filed on said date as the verdict of the jury in said cause * * *."

Bank does not question the rule that the trial court not only has the right, but the duty to receive a partial verdict which will sustain a judgment. Stalder v. Bowen, 373 S.W.2d 824 (Tex.Civ.App.—Dallas 1964, writ ref'd n. r. e.); McDonald, Texas Civil Practice, § 15.03(A). It urges, however, that this verdict was not received by the trial court before May 19, 1967, and prior thereto at least one of the jurors had expressed disagreement with one or more of the answered issues. A difficulty in this question is presented by the statement of the trial court at a hearing on May 19, 1967, that "the Court did not formally receive it as a verdict." Such statement made in reference to the acceptance of the partial verdict is verified by the civil docket sheet of this case and by an approved bill of exception.

It has been held that a verdict does not become an official act and effective in law until it is received and accepted by the trial court, and before that time, and up to the time of tender and acceptance, any juror may dissent therefrom. Robertson Tank Lines, Inc. v. Sawyer, 416 S.W.2d 886 (Tex.Civ.App.—Corpus Christi 1967, no writ); State v. Finch, 349 S.W.2d 780 (Tex.Civ.App.—San Antonio 1961, no writ); Lee v. Galbreath, 234 S.W.2d 91 (Tex.Civ.App.—El Paso 1950, no writ). It is seen that none of these cases or the cases cited therein discuss the question of what constitutes "receipt and acceptance" of the verdict. Rules 293–295, Texas Rules of Civil Procedure, set forth the requirements for receiving a verdict of the jury. There is no requirement that a judge do or say anything to formally indicate his receipt and acceptance of the verdict. Certainly better practice would require that the judge state at such time either that the verdict is received for entry of such judgment as might be appropriate or that a mistrial is expressly declared.

Here neither party requested a mistrial when the verdict was returned and the record is clear that the trial court did not declare a mistrial. Cf. Wheeler v. Oxford, 321 S.W.2d 188 (Tex.Civ.App.—Eastland 1959, no writ). The partial verdict was examined by the trial court, and after the jury was polled by reading each of the issues answered, and after all the jurors acknowledged agreement to each of same, the judge requested the foreman to sign the verdict. Neither party requested further poll of the jury. Under these facts we hold that the partial verdict was received and accepted by the trial court as required to form the basis of a final judgment. Barker v. Weingarten Riverside Co., 232 S.W.2d 692 (Tex.Civ.App.—Beaumont 1950, writ ref'd n. r. e.).

On October 18, 1963, plaintiff executed a note in the principal sum of $2,000, payable to Bank and said sum was deposited in a checking account plaintiff opened with the Bank. Although both parties understood the note was to be payable in six months. the note was actually payable upon demand. Said note was not paid on demand made after six months, and on July 2, 1964, Bank filed suit against plaintiff in the District Court of Gillespie County seeking judgment for the sum of $2,200, being unpaid principal and stipulated attorney's fee with interest on said sum. At the same time, application was made for issuance of a writ of attachment based on the affidavit of the assistant cashier of Bank that the debt was due "for property

obtained under false pretenses."[2]   A writ was issued to the Sheriff of Kerr County commanding him to attach so much of the property of plaintiff as shall be of value sufficient to satisfy the sum of $2,200 and costs of suit.   Accordingly, on July 7, 1964, a deputy sheriff, at the direction of Arthur Stehling, Esq., President of Bank, attached the following property on the hog farm in Kerr County which was operated by plaintiff: 1 water tank; 3 grain bins; a Crimp-O-Matic feed mill; 4 grain augers with electric motors attached, and approximately 460 head of pigs.   The pigs, 429 by actual count, were sold by order of court at public sale on July 27, 1964, for the sum of $3,643.20.   After deducting the expense of feeding and caring for the pigs between the time of attachment and sale, including the sum of $1,364.31 paid to plaintiff for his time and expense in caring for such pigs, a net of $1,582.86 was realized.   On December 8, 1964, the other attached property was sold by court order and a net of $777.00 was realized.   Final judgment was entered in the Gillespie County suit on July 22, 1966, whereby Bank recovered the sum of $2,433.

On September 14, 1964, plaintiff filed this suit in Kerr County against Bank and the two sureties on its attachment bond seeking damages for wrongful attachment. It was alleged that the attachment was wrongfully sued out, in that the loan of October 18, 1963, was not obtained under false pretenses and, further, was maliciously sought for the purpose of injuring plaintiff, since the Bank would not have lost its debt in the absence of such attachment. In the alternative it was alleged that too much property was attached and that exempt property was also attached.   Plaintiff sought actual damages in the sum of $162,722 for destruction of his business, for humiliation and mental anguish, and loss of future profits.   He also alleged that said action was done with malice and sought exemplary damages in the sum of $50,000.

The jury was unable to agree on the issues regarding exemplary damages and by his motion for judgment plaintiff waived recovery of same.   After crediting Bank with an offset for the amount of its judgment on the note, judgment was rendered for plaintiff for the sum of $34,643.72 for his actual damages.   A take-nothing judgment was entered as to the sureties and no cross-appeal was perfected.   This judgment is based solely on the jury's answer to Issue No. 1, whereby in effect the jury found that plaintiff did not, prior to the loan being made, make any of the false representations which the Bank had alleged as the basis of its claim that the money was obtained under false pretenses.   The issues submitted on plaintiff's claim that exempt property was attached were withdrawn by the judge from the jury's consideration during their deliberations.   The jury was unable to agree on the issue as to whether the Bank would have lost its debt if it had not caused the attachment to be issued, and, although the jury found that Arthur Stehling was not justified in causing the deputy to levy upon all the attached property, it was unable to agree upon an answer as to what property was unjustifiably attached.

Bank urges by its first four points that the trial court erred in failing to grant its motion for judgment non obstante veredicto, in that the undisputed evidence establishes that the loan was made to plaintiff based upon his false representations as to his financial condition.   Bank thereby urges that as a matter of law Issue No. 1 should not have been submitted.   Grouped with these four points are two points whereby Bank complains that Issue No. 1 is not an ultimate issue, in that it does not submit all of the essential alleged representations, as the jury was not asked if plaintiff did not promise the Bank that the proceeds of the loan of October 18, 1963, would be used to discharge the indebtedness he owed on the Crimp-O-Matic feed mill.

2.   Art. 275(12), Vernon's Ann.Civ.St.

It is undisputed that plaintiff signed a handwritten and a typed financial statement for said Bank on the occasion when the loan was made. The relationship of said statements to the $2,000 loan sued on by Bank, as well as the details concerning the actual preparation of the financial statements, is very conflicting. In determining the "no evidence" points raised by Bank's first four points, we must consider only the evidence and the inferences tending to support the jury finding and disregard all evidence and inferences to the contrary. Garza v. Alviar, 395 S.W.2d 821 (Tex.Sup.1965).

Plaintiff and Edmona Bowden were married about January 30, 1963. Shortly thereafter said couple, together with her two minor children from a prior marriage to Hollis Bowden, moved to Kerr County, and on February 13, 1963, plaintiff leased a farm belonging to W. M. Flenniken, Cdr. U. S. Navy. This farm consisted of a house and 40.21 acres of land. Plaintiff verbally assumed the remainder of a one-year lease which expired on August 26, 1963, and provided for rental of $135.00 per month. On August 21, 1963, plaintiff entered into a one-year written lease of said property with an option to renew same for an additional year at the same rental. Cdr. Flenniken testified that he anticipated retiring from the Navy in 1965 and therefore advised plaintiff that two years was the limit of the lease. However, on April 20, 1964, plaintiff was given a written option to purchase said property for the sum of $52,500, which option expired on August 9, 1964, without being exercised. Plaintiff remained on said property under his lease agreement until sometime in July, 1965.

Although all of plaintiff's prior work had been in the oil fields, his purpose in moving to Kerr County was to go into the hog business. He had no prior experience in this line of work but had done extensive research on the subject. He desired to put in a pig feeder operation whereby he would obtain feeder pigs weighing about 30–40 pounds and sell them at about 200–220 pounds. Accordingly, the written lease plaintiff executed with Cdr. Flenniken authorized him to install feed pens on said property at his own expense, with the express agreement that all such improvements would be left intact and become property of lessor at the expiration of said lease. Between March and October, 1963, numerous permanent improvements were made on said premises, including installation of concrete ditches and slabs, self-feeders, water troughs, fences and pens. Plaintiff also placed a water tank, grain bins and a feed mill on the property.

By September, 1963, the installation was completed to the extent that plaintiff could handle about half the number of pigs he wanted to feed and he advertised in the local newspaper for feeder pigs. Mr. Stehling saw this ad and since he had a large brood-sow farm, he responded to said ad. On October 18, 1963, plaintiff called on Stehling at the Bank in Fredericksburg in response to Stehling's inquiry. Plaintiff testified that Stehling agreed to furnish plaintiff with feeder pigs from his farm and that the Bank would finance the feeding of same. Although considerable testimony was given relative to such purported agreement, plaintiff did not testify to the terms of the agreement, and no complaint was urged as to the failure of Stehling or the Bank to carry out any such agreement. Plaintiff testified, however, that in connection with such conversation, Stehling asked him if he needed anything else. Plaintiff advised Stehling that he could use $1,850 to pay off the feed mill. Whereupon Stehling got out a note and said, "Let's just make that for $2,000." Plaintiff said six months would be long enough for him to repay the note and accordingly signed same. Plaintiff testified that it was not until after the note was signed that Stehling stated that as a formality the Bank would need a financial statement, and Stehling then took him to Mr. Pyka, another officer of the Bank, and instructed Pyka to take a financial statement from plaintiff. This was done by plaintiff sitting across Pyka's desk and answering

questions, asked by Pyka, necessary to complete the Bank's financial statement form. After Pyka completed the handwritten copy of such form, plaintiff signed it and the two men returned to Stehling's office where Stehling checked it over. Under "Other Current Assets" had been written "Oil Royalties—Est. 7200.00." Stehling advised that the correct way to compute such item was to multiply the annual amount of royalties by ten, and he therefore advised Pyka to change this figure to $72,000 and to correct the other affected totals, and then to type up said corrected statement. Plaintiff had indicated during such conversation his desire to do business with the Bank, and therefore Stehling took him to the office of his nephew, Harold Stehling, and instructed the latter to fill out the necessary forms for opening an account. After completion of these forms, plaintiff was instructed to go by Pyka's office and sign the typed financial statement. This was done, and it is significant that, in response to a juror's question, Pyka admitted plaintiff signed it but did not read it over.

Bank alleged and now urges that the financial statement is false in several respects and therefore the loan was secured by false pretenses. It cannot be seriously disputed that the financial statements signed by plaintiff are both incorrect at best. The handwritten form showed a net worth of plaintiff of $139,100 and the typed form showed a net worth of $212,250. Actually, plaintiff's financial holdings at said time consisted of only a community interest in the "cash listed at $2200," and the machinery and fixtures installed or located on the hog farm of the stated value of $11,750. In addition he claimed a 1958 Jeep, although in a subsequent divorce action, his wife said that same was her separate property. Against these assets were listed liabilities of $8,350. Admittedly there were other liabilities, such as an informal loan of $7,500 from his parents, but plaintiff testified that he was not asked about his liabilities. Furthermore, the actual cash on hand was only about $1,700, unless the $2,000 which he had just borrowed from Bank is included, and in that event an offsetting liability of $2,000 should be set forth. The remainder of the listed property was the separate property of plaintiff's wife or belonged to her children.

Plaintiff testified, however, that Pyka expressly instructed him to list all property, whether owned by plaintiff, his wife, or by the children. This testimony of plaintiff is corroborated in part at least, in that title to all the real estate, which had a total valuation of $108,350 is listed as being in his wife's name. Furthermore, there are three corporations, with total stock valuation of $14,554, set forth in detail on the back page of the form, of which only $10,000 was included on the first page as an asset. Plaintiff testified that he advised Pyka that the children owned this stock jointly and, at least the $4,554 was so marked, with a legitimate question raised as to whether the other $10,000 should also have been so marked. Furthermore, plaintiff testified that he was asked as to the cash value of life insurance on all members of the family. Actually, the title to 40.8 acres of land, valued at $81,600, was in the name of plaintiff's father-in-law to whom it had been conveyed by plaintiff's wife on January 23, 1963, prior to her marriage to plaintiff, and a lawsuit was pending to set aside such deed for fraud. Plaintiff testified that he so advised Pyka and the jury finding supports such explanation. Subsequent developments also raised a question as to whether the oil royalties were owned by plaintiff's wife as her separate property or as trustee for her minor children.

■ Bank pleaded in its answer that the financial statement was false in each of the above enumerated respects. Special Issue No. 1 inquired if any of seven enumerated representations were made prior to the loan being made to him by the Bank with the burden of proof being assumed by plaintiff. The jury's answer that plaintiff did not make any of such representations is supported by plaintiff's testimony that

the loan was agreed to prior to any conversation relative to a financial statement. There is testimony that all State banks are required to have a financial statement on file to support all loans of over $500, and the jury could believe such statement was furnished as an afterthought and as a formality. Further, such answer is supported by plaintiff's testimony that Pyka requested financial holdings by all the family. Bank's officials undoubtedly believed at this time that plaintiff was a man of considerable substance. Pyka was not aware of the fact that plaintiff and his wife were only recently married and that the children were not plaintiff's. In the absence of such information he would logically be interested in property owned by the entire family. In any event, when the record is viewed from the no evidence test, there is more than a scintilla of evidence supporting the jury's findings.

In addition to the seven enumerated representations inquired about in Issue No. 1, Bank alleged that the loan was secured by plaintiff's false promise that he would use the $1,850 to pay off the Crimp-O-Matic feed mill. Bank objected to said Issue No. 1 because of the failure to inquire as to this representation, and it submitted two requested issues to include same. Plaintiff admits that he told Arthur Stehling that he planned to use the loan proceeds for this purpose. He did not do so in that because of a mix-up the wrong mill was delivered by the company and the bill was not due until the correct one had been delivered and checked out. Therefore the bill did not actually become due until after or about the time of the attachment. Plaintiff urges that his statement to Stehling was merely a statement of his intention to do something in the future and could not constitute a basis for a claim of fraud by "false pretense." See 39 A.L.R.2d 1270; Scott v. S. H. Kress & Co., 191 S.W. 714 (Tex.Civ.App.—Fort Worth 1917, writ ref'd).

The general rule is that ordinarily a promise to perform some act in the future, although made by one party as a representation to induce the other to enter into the contract, will not amount to fraud in legal acceptation, though subsequently the promise is, without excuse, entirely broken and non-fulfilled, unless done with the design of cheating or deceiving the second party. Chicago, T. & M. C. Ry. Co. v. Titterington, 84 Tex. 218, 19 S.W. 472 (1892); 41 T.L.R. 699. There is no evidence in this case to support an inference that plaintiff made such representation with the design of cheating or deceiving the Bank. The bill of Crimp-O-Matic was not produced at the time of plaintiff's discussion of the loan with Bank, and there was little said relative to same. Bank did not have or even seek to place a chattel mortgage on this mill at that time. Under this record, the court did not err in refusing to include this alleged misrepresentation as a part of Issue No. 1.

Bank urges that the trial court erred in overruling its plea in abatement wherein it urged that this suit for wrongful attachment was a compulsory counterclaim to its suit against plaintiff on the note. A similar contention was overruled in Capetillo v. Burress & Rogers, 203 S. W.2d 953 (Tex.Civ.App.—Galveston 1947, writ ref'd n.r.e.), wherein it was held that Rule 97(a), T.R.C.P., is not applicable to a suit for wrongful sequestration. The same rule has been held applicable to suits for wrongful attachment. Fisher v. Howard, 389 S.W.2d 482 (Tex.Civ.App.—Dallas 1965, no writ); 6 Tex.Jur.2d, Attachment, 648, 661. Bank's seventh point is therefore overruled.

Bank complains of the court's charge by a number of points. Its 20th and 21st points complain of the charge as a whole and the failure to give Bank's requested charge. These points are too general for consideration. Rule 418, T.R.C.P.; Wagner v. Foster, 161 Tex. 333, 341 S.W. 2d 887 (1960). Bank also complains of the definitions given in the charge to the words "separate property," "community

property" and "proximate cause," and of the court's failure to define "a lawful attachment" and "false pretenses." Nothing is gained by defining terms such as these which are not included in any of the issues submitted to the jury. However, reversible error is not shown by the definitions given to these three terms or by the failure to define the other two terms which were not used in the charge or inquired about in any of the issues. Furthermore, Bank's point complaining of the definition of "justified" in Issues Nos. 8 and 9 does not present reversible error. The jury was unable to agree to Issue No. 9, and therefore the question of whether Bank was justified in levying on all the property it attached formed no basis for the judgment and we cannot say that Bank was prejudiced on other issues by said definition.

■ Bank's points thirteen and fourteen complain of the submission of the issues relating to whether it had levied on exempt property. Inasmuch as these issues were withdrawn from the jury's consideration before they were answered and form no basis for the judgment, reversible error is not shown by same.

■ Points fifteen and sixteen complain of the submission of Issue No. 16, together with the accompanying instruction, in that there is no evidence that plaintiff owned the feed mill at the time of the attachment. We see no basis for submitting such issue, in that it is merely evidentiary and forms no part of the judgment. In any event, the evidence is largely undisputed regarding plaintiff's agreement to purchase this mill. The mill was placed on this property with the understanding that plaintiff would pay for it after it was put in satisfactory operation. Although plaintiff testified that he had notified the mill salesman that the feed mill was working satisfactorily shortly before the attachment, he concedes that he had not paid for same. Under the uncontradicted evidence, after the attachment Bank delivered the mill to the sales representative for the

Crimp-O-Matic Company in compliance with the written suggestion of plaintiff that it belonged to said company. The only relevancy the feed mill has to this appeal is that under this record plaintiff is not entitled to recover the value of said mill.

■ The trial court did not err in refusing to admit evidence of plaintiff's felony conviction in June, 1956. Said conviction was subsequently set aside and the cause dismissed in accordance with Art. 780, Vernon's Ann.C.C.P. (now Art. 42.12, Vernon's Ann.C.C.P.). In any event, said conviction was too remote. Missouri Pacific Railroad Co. v. Miller, 426 S.W.2d 569 (Tex.Civ.App.—San Antonio 1968, no writ). Nor is reversible error shown by Bank's complaint of improper argument.

By its points 17, 18 and 19, Bank complains of the submission of Issues Nos. 18, 19 and 20, and the awarding of certain special damages based on the jury's answers thereto. In Issue No. 18 the jury found that the sum of $20,000 would fairly and reasonably compensate plaintiff "for the net profits, if any, which he would in all reasonable probability have made from the operation of his hog farm from July 7, 1964 to date of trial (March 8, 1967), but was prevented from making as a proximate result of the attachment * * *." In Issue No. 19, the jury found that the sum of $9,000 would reasonably compensate plaintiff for the fair market value of improvements attached to the hog farm which were lost as a proximate result of the attachment. In Issue No. 20, the jury found that the sum of $528 would reasonably compensate plaintiff for the amount of the ground lease he had paid on the hog farm prior to the attachment, the benefit of which was lost as a proximate result of the attachment. As heretofore mentioned, an exemplary damage issue was submitted to the jury but the jury was unable to agree upon same.

A substantial part of this lengthy trial was devoted to the special damages of

plaintiff. Although not submitted in the charge as an element of damage, plaintiff contended that his marriage was broken up as a result of the attachment, and much of this lengthy record relates to plaintiff's relationship with his wife. Plaintiff also testified at length concerning his unpleasant relationship with his father-in-law, both before and after the attachment. Plaintiff remained on the hog farm until his lease substantially expired in July, 1965, but did not secure any more pigs after the attachment. He testified that he was unable to obtain credit to purchase other feeder pigs and blamed the attachment for this result. In submitting Issues Nos. 18 and 19, the court apparently assumed that plaintiff would have exercised his option to purchase the hog farm but for the attachment, and would have remained on same until the time of trial. Accordingly, plaintiff introduced evidence to show his probable net profits based upon a planned cycle of buying and feeding 460 pigs every three months between July 7, 1964, and the date of the trial. The probable cost of feed and prospective gross receipts based on the market price of pigs at such intervals were shown over said projected periods in order to calculate plaintiff's net profits.

Said issues erroneously assume that the loss of profits, loss of the value of the fixtures attached to the leased land, and loss of the value of the ground lease were proximate results of the attachment. This erroneous assumption is also contained in the court's definition of "proximate result." Furthermore, said issues assume that the attachment destroyed plaintiff's credit. This fact was highly contested in that, as shown by plaintiff's own testimony, he experienced considerable difficulty in trying to borrow money even before this attachment. Although the feeder plant was substantially completed in the fall of 1963, plaintiff was not able to finance the purchase of any pigs until shortly before the attachment. He was turned down by several banks before securing a loan through Mr. Eggers, a personal friend. Eggers had known plaintiff twelve years and had visited plaintiff and his wife many times on the hog farm. Eggers testified that he was worth four to five hundred thousand dollars and made an unsecured loan of $7,000 to help plaintiff get started. Eggers was familiar with all the details of the attachment, and it is difficult to conceive how this wrongful attachment could damage plaintiff's credit reputation with such friend. Furthermore, such an assumption ignores plaintiff's limited financial condition when his wife's separate property, as well as that belonging to her children, is excluded, which would undoubtedly affect his ability to secure a loan to finance his new venture of purchasing and feeding pigs. Also it ignores the effect of plaintiff's failure to repay Bank's note as well as other admitted past-due obligations.

Said issues also erroneously assume that plaintiff would have exercised his option to purchase Cdr. Flenniken's land, although he had never posted any earnest money and had less than thirty days left on his option to close the sale. Furthermore, the jury answered "None" in response to Issue No. 22, wherein inquiry was made as to what amount would reasonably compensate plaintiff for his loss in not being able to exercise said option. Such finding obviously conflicts with the award of $9,000 based on the fair market value of the fixtures attached to the leased land as well as for other damages allegedly incurred after his lease expired.

All of the special damages inquired about in Issues Nos. 18, 19 and 20 grow out of plaintiff's claim that the attachment destroyed his credit. However, this claim was properly submitted as an element under the exemplary damage issue. Traweek v. Martin-Brown Co., 79 Tex. 460, 14 S.W. 564 (1890); First Nat. Bank v. Cooper, 12 S.W.2d 271 (Tex.Civ.App.—Amarillo 1928, writ ref'd); 6 Tex.Jur.2d § 203; 41 T.L.R. 714.

■■ The errors in the submission of the special damage issue in the court's

charge require a reversal and remand of this case. However, such issues have no relationship to Issue No. 17, wherein the jury found that the fair market value of the attached personalty on July 7, 1964, was $7,398, and no complaint is urged to such issue other than as to the item of $1,850, found as the value of the Crimp-O-Matic feed mill. Judgment can be affirmed for the fair market value of the personalty belonging to plaintiff which was wrongfully attached together with interest from date of such wrongful attachment, if plaintiff is willing to waive or remit his prayer for recovery for the items of special damages covered by Issues Nos. 18, 19 and 20. Curtis v. Carey, 393 S.W.2d 185 (Tex.Civ.App.—Corpus Christi 1965, no writ).

Unless such a remittitur or waiver is filed with this Court within ten days hereof, the judgment of the trial court will be reversed and the cause remanded as to plaintiff's suit against Bank.

On Filing of Remittitur.

Appellee has timely filed a remittitur for the special damages in the amount of $29,528, as well as for the market value of the Crimp-O-Matic feed mill in the amount of $1,850, in compliance with the suggestion in our original opinion.

Accordingly, the judgment of the trial court is hereby reformed to provide that Charles D. Craighead do have and recover of and against the Security State Bank & Trust the sum of Three Thousand Two Hundred Sixty-five Dollars and Seventy-two Cents ($3,265.72), plus interest at the rate of 6% per annum from July 7, 1964, to date on the sum of $6,088.00.

As reformed, the judgment is affirmed and shall bear interest hereafter at the legal rate of 6% per annum. The costs of this appeal are hereby taxed one-third against the appellant and two-thirds against the appellee.

Appellant's motion for rehearing and appellee's motion for rehearing are overruled.